UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AU ELECTRONICS, INC., ADNAN VADRIA, and UMAIR YASIN, | )<br>)<br>) 13 C 5947 |
| Plaintiffs/Counter-Defendants, | )<br>) Judge Feinerman |
| vs. | )<br>) |
| HARLEYSVILLE GROUP, INC., | )<br>) |
| Defendant, | )<br>) |
| and | )<br>) |
| HARLEYSVILLE LAKE STATES INSURANCE CO., | )<br>) |
| Defendant/Counter-Plaintiff. | ) |

**MEMORANDUM OPINION AND ORDER**

This insurance coverage dispute pits AU Electronics, Adnan Vadria, and Umair Yasin (collectively, "AU," unless context requires otherwise) against Harleysville Group and Harleysville Lake States Insurance Company (together, "Harleysville," unless context requires otherwise). In the underlying suits, Sprint and T-Mobile, the large wireless network providers, alleged that AU bought cellphones in bulk, "unlocked" them so that they could be used on any cellular network, and then resold them overseas. *Sprint Nextel Corp. v. AU Elecs., Inc.*, No. 12 C 9095 (N.D. Ill. filed Nov. 13, 2012); *T-Mobile USA, Inc. v. AU Elecs., Inc.*, No. 12 C 10046 (N.D. Ill. filed Dec. 18, 2012); *see* Docs. 100-3, 100-4 (the complaints in those suits). Both suits settled. Doc. 120 at ¶¶ 45-46; *see* Final Judgment and Permanent Injunction, *Sprint Nextel Corp. v. AU Elecs., Inc.*, No. 12 C 9095 (N.D. Ill. Jan. 23, 2014), ECF No. 210; Final Judgment and Permanent Injunction, *T-Mobile USA, Inc. v. AU Elecs., Inc.*, No. 12 C 10046 (N.D. Ill. Jan. 23, 2014), ECF No. 201.

1

Well after the underlying suits commenced and before they settled, AU brought this case, which alleges that Harleysville breached its duty to defend and indemnify AU in those suits. Doc. 1. Harleysville answered and counterclaimed for a declaration that it owed no such duty. Docs. 9, 18. The parties have filed cross-motions for summary judgment. Docs. 93, 99. AU's motion is denied, and Harleysville's is granted.

## Background

When considering Harleysville's summary judgment motion, the facts are considered in the light most favorable to AU, and when considering AU's motion, the facts are considered in the light most favorable to Harleysville. *See In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) ("With cross summary judgment motions, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012). That said, many of the following facts are undisputed; any contested facts will be noted.

Vadria founded AU Electronics, a consumer electronics store, in mid-2011; he is the company's president and co-owner. Doc. 105 at 3, ¶ 2; Doc. 128 at ¶¶ 1-2, 6. Yasin's father is the company's other co-owner. Doc. 128 at ¶¶ 3-4. Yasin says that he "assisted" his father with the business "to help him overcome cultural and language barriers," *id.* at ¶ 5; Sprint's complaint alleged that Yasin was "the sales and purchasing director of AU Electronics," Doc. 100-3 at ¶ 16.

In 2011, AU purchased a business insurance policy from Harleysville. Doc. 120 at ¶ 65; *see* Doc. 100-1 (copy of the policy). The policy obligates Harleysville to defend and indemnify AU for any "personal and advertising injury" suffered by a third party due to AU's conduct. Doc. 120 at ¶ 69; *see* Doc. 100-1 at 45-46 (Policy § II.A.1.b(2)). The policy provides liability

coverage of up to $1 million per occurrence and $2 million in the aggregate. Doc. 120 at ¶ 69; *see* Doc. 100-1 at 5.

In late 2012, Sprint and T-Mobile each filed suit against AU Electronics, Vadria, and Yasin, Doc. 128 at ¶ 1, alleging that they engaged in a scheme to purchase cellphones in the United States, reprogram them so that the phones were no longer tethered to Sprint's or T-Mobile's networks, and then resell the phones overseas, usually stripped of all packaging and documentation. Doc. 120 at ¶¶ 13-18, 26-31; *see* Doc. 100-3 at 1-36 (*Sprint* complaint); Doc. 100-4 at 1-35 (*T-Mobile* complaint). The underlying complaints stated various statutory and common law claims, including under the Lanham Act, 15 U.S.C. § 1051 *et seq*. Doc. 120 at ¶¶ 19-21, 32-34; *see* Docs. 100-3, 100-4. Sprint alleged trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114, and "federal common law" trademark infringement under § 43(a) of the Lanham Act, 15 U.S.C. §§ 1125(a)(1)(A) & (B). Doc. 100-3 at ¶¶ 154-170. T-Mobile brought only a federal common law trademark infringement claim under § 43(a). Doc. 100-4 at ¶¶ 90-99. Both Sprint and T-Mobile based their § 43(a) claims on the allegation that AU's activities "constitute[d] false designation of origin, false descriptions and representations, and false advertising." Doc. 100-3 at ¶ 168; Doc. 100-4 at ¶ 97. Specifically, Sprint alleged that AU's

> use of the Sprint Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and businesses of [AU] have some connection, association, or affiliation with Sprint, and thus constitutes false designation of origin and is likely to mislead the trade and public into believing that [AU's] products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Sprint.

3

Doc. 100-3 at ¶ 165. T-Mobile alleged the same thing with respect to the T-Mobile marks. Doc. 100-4 at ¶ 93. AU denies that it engaged in that misconduct, but does not deny that Sprint and T-Mobile *alleged* that it did. Doc. 120 at ¶¶ 13-18, 26-31.[*]

As noted, AU's insurance policy covers "personal and advertising injury," a term defined to include "[t]he use of another's advertising idea in your 'advertisement.'" Doc. 120 at ¶ 70; *see* Doc. 100-1 at 59 (Policy § II.F.14.f). The policy excludes coverage for "personal and advertising injury … arising out of the infringement of … trademark, trade secret, or other intellectual property rights." Doc. 120 at ¶ 71; *see* Doc. 100-1 at 52 (Policy § II.B.1.p(12)). But the exclusion "does not apply to infringement, in your 'advertisement', of copyright, *trade dress* or slogan." Doc. 120 at ¶ 71 (emphasis added); *see* Doc. 100-1 at 52 (Policy § II.B.1.p(12)). Thus, trademark claims are excluded from coverage, but trade dress claims are not.

Shortly after Sprint and T-Mobile filed their suits, AU and its counsel "reviewed the Policy to determine coverage" but "concluded that they needed more information to determine whether the Underlying Lawsuits were covered or excluded under the Policy." Doc. 105 at ¶ 11. On July 16, 2013, Sprint and T-Mobile produced in discovery lists of people with whom they claimed AU had conspired. The lists included everyone who—based on the carriers' review of AU's own invoices and purchase orders, which AU had earlier produced in discovery—had sold

---

[*] The United States filed a forfeiture action against funds allegedly derived by AU Electronics and Vadria from the alleged misconduct; according to the forfeiture complaint, the alleged misconduct violated 18 U.S.C. §§ 1956(a)(2)(A) and 1956(h), and the funds constitute proceeds traceable to the transportation and sale, and receipt of, stolen goods in violation of 18 U.S.C. §§ 2314 and 2315. See Verified Complaint of Forfeiture, *United States v. Funds in the Amount of $246,197.44 Seized from JP Morgan Chase Bank Account XXXXX9895*, No. 14 C 1570 (N.D. Ill. Mar. 6, 2014), ECF No. 1. The forfeiture action remains pending.

4

at least two new Sprint or T-Mobile phones to AU. Doc. 105 at ¶ 22; *see* Docs. 100-8, 100-9 (the lists).

AU says that after receiving those lists from Sprint and T-Mobile, it "determined that *for the first time* [it] had a reasonable basis for seeking coverage or indemnification" from Harleysville. Doc. 105 at ¶ 23 (emphasis added). AU sent a tender for defense and indemnity to Harleysville on July 31, 2013. *Ibid*. AU's letter stated that "it has recently become clear to us through discovery that [Sprint and T-Mobile] are not alleging trademark infringement, *per se*, but are actually alleging *trade dress* infringement, which is expressly covered by the Policy," Doc. 100-10 at 2 (copy of letter). The letter further stated:

> For instance, the Sprint Complaint alleges that … "Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of certain federally registered Sprint Marks without authorization in connection with their conspiracy to sell and offer for sale unlocked, counterfeit Sprint Phones, which downstream customers will discover have been altered from their original state and do not include the warranties, accessories, manuals and related items that *constitute part of the Sprint Phone Package*." [Doc. 100-3] at ¶ 155 (emphasis added). There are similar allegations made by T-Mobile in the T-Mobile complaint. …
>
> These are not trademark infringement claims, *per se*. They are claims for *trade dress infringement* because Sprint and T-Mobile are alleging, among other things, that the devices that AU buys and restless are *materially different* from what Sprint and T-Mobile sell, because they are not the original "Sprint Phone package."

*Ibid*. (emphases in original).

AU had not contacted Harleysville or told it about the *Sprint* and *T-Mobile* lawsuits prior to sending the July 31, 2013 letter. Doc. 105 at ¶ 23; Doc. 120 at ¶¶ 67-68. The policy states that "[i]f a claim is made or 'suit' is brought against any insured, you must (1) Immediately record the specifics of the claim or 'suit' and the date received; and (2) Notify us as soon as practicable. You must see to it that we receive written notice of the claim or 'suit' as soon as practicable." Doc. 120 at ¶ 72; *see* Doc. 100-1 at 56 (Policy § II.E.2.b). The policy defines

5

"suit" to include "a civil proceeding in which damages because of … 'personal and advertising injury' to which this insurance applies are alleged." Doc. 100-1 at 60 (Policy § II.F.18).

On August 14, 2013, a Harleysville claims consultant told Vadria that "it does not appear our coverage will respond," meaning that the *Sprint* and *T-Mobile* lawsuits were likely excluded from coverage. Doc. 105 at ¶¶ 34-35; Doc. 131 at ¶ 13. AU immediately began negotiating a settlement with Sprint and T-Mobile, and it signed settlement agreements with both of them on August 16, 2013. Doc. 120 at ¶ 44; Doc. 131 at ¶ 17. AU filed this coverage case four days later, seeking both a declaration that Harleysville had a duty to defend and indemnify it in the underlying suits and also damages for breach of the policy. Doc. 1. Harleysville answered and asserted affirmative defenses, which among other things allege that: (1) AU's July 31, 2013 tender was untimely; (2) the carriers' suits did not allege a "personal and advertising injury" under the policy; and (3) even if the suits did allege an advertising injury, one or more of the policy exclusions apply. Doc. 9. Harleysville also counterclaimed for a declaration that, under the policy, it owed no duty to defend or indemnify AU in the underlying suits. Doc. 18. (Another AU insurer brought a separate action for a declaration that it, too, owed no duty to defend or indemnify AU in the *Sprint* and *T-Mobile* suits; that case has settled. *See* Order Dismissing All Claims and Counterclaims With Prejudice, *Ohio Sec. Ins. Co. v. AU Elecs., Inc.*, No. 13 C 6626 (N.D. Ill. June 9, 2014), ECF No. 74.)

AU has moved for summary judgment on its claims, on three of Harleysville's four affirmative defenses, and on Harleysville's counterclaim. Doc. 99 at 1. Harleysville has moved for summary judgment on all claims and counterclaims, including on all of its affirmative defenses. Doc. 93.

**Discussion**

Harleysville is entitled to judgment on two separate and independent grounds. First, it had no duty to defend or indemnify AU in the *Sprint* and *T-Mobile* suits. Second, even if Harleysville had such a duty, AU's tender to Harleysville was untimely.

I.  **Harleysville's Duty to Defend and Indemnify AU**

Harleysville argues that the *Sprint* and *T-Mobile* complaints allege claims that either are not covered by the policy or that fall within an exclusion to coverage. AU counters that the suits allege either the "use of another's advertising idea in [their] advertisement" or, alternatively, a trade dress claim, both of which are covered. Both sides agree that under Illinois law, "[t]he factual allegations of the [underlying] complaint, rather than the legal theory under which the action is brought, determine whether there is a duty to defend." *Amerisure Mut. Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 815 (7th Cir. 2010) (quoting *Pekin Ins. Co. v. Dial*, 823 N.E.2d 986, 990 (Ill. App. 2005)); *see also Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr., Inc.*, 566 F.3d 689, 696 (7th Cir. 2009). Illinois courts "give little weight to the legal label that characterizes the underlying allegations. Instead, [they] determine whether the alleged conduct arguably falls within at least one of the categories of wrongdoing listed in the policy." *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 346 (7th Cir. 2010) (quotation marks omitted) (quoting *Lexmark Int'l, Inc. v. Transp. Ins. Co.*, 761 N.E.2d 1214, 1221 (Ill. App. 2001)).

As noted, the policy excludes coverage for advertising injury caused by trademark infringement but not by trade dress infringement. Doc. 120 at ¶ 71; *see* Doc. 100-1 at 52 (Policy § II.B.1.p(12)). "[T]rade dress infringement and trademark infringement are two different causes of action." *Greenwich Ins. Co. v. RPS Prods., Inc.*, 882 N.E.2d 1202, 1212 (Ill. App. 2008).

"[A] product's *trade dress* is the overall image used to present it to its purchasers; it could thus include, to give a partial list, the product's size, shape, color, graphics, packaging, and label. A *trademark* on the other hand is thought of as something more specific, such as a logo." *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1182 (7th Cir. 1989) (internal quotation marks, brackets, and citations omitted).

The *Sprint* and *T-Mobile* complaints allege only trademark infringement, not trade dress infringement. Their allegations involve use of the Sprint or T-Mobile "Marks"—that is, their logos. Specifically, the complaints allege that AU's customers could become confused into believing that they were buying Sprint or T-Mobile cellphones when in fact, by reprogramming them, AU effectively turned them into different cellphones, yet ones still (misleadingly) marked with a Sprint or T-Mobile logo. Doc. 100-3 at ¶¶ 161-177; Doc. 100-4 at ¶¶ 90-99. Nothing in either complaint suggests that Sprint or T-Mobile were concerned that customers might become confused because of the size, shape, color, etc.—the "look and feel"—of the phones. *Cf. Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000) ("'trade dress' [is] a category that originally included only the packaging, or 'dressing,' of a product, but in recent years has been expanded … to encompass the design of a product"); *Lexmark Int'l*, 761 N.E.2d at 1224 ("The trade dress of a product is essentially 'its total image and overall appearance.'"). The *Sprint* and *T-Mobile* complaints thus allege straightforward trademark, not trade dress, claims. *See Greenwich Ins. Co.*, 882 N.E.2d at 1204 (holding that the underlying complaint's allegation that the underlying defendants sold air filters in a box that "prominently displays the claim that it 'Fits Holmes®'" humidifiers and air purifiers stated a trademark, not trade dress, claim and therefore was excluded from coverage); *cf. Selective Ins. Co. of Se. v. Creation Supply, Inc.*, 2015 IL App (1st) 140152-U, at ¶¶ 35-37, 2015 WL 522247, at *9-10 (Ill. App. Feb. 9, 2015)

8

(holding that an underlying complaint alleged trade dress infringement where it claimed that "'Defendants' unauthorized use of Plaintiffs' squarish marker body configuration and squarish marker cap-end configuration in connection with marker products … is likely to cause confusion and mistake, and to deceive consumers as to the source or origin of Defendants' products'").

In urging the opposite result, AU cites *Cincinnati Insurance Co. v. East Atlantic Insurance Co.*, 260 F.3d 742 (7th Cir. 2001), which holds that "[w]hat is important is not the legal label that the plaintiff attaches to the defendant's (that is, the insured's) conduct, but whether that conduct as alleged in the complaint is at least *arguably* within one or more of the categories of wrongdoing that the policy covers." *Id*. at 745 (emphasis added); *see also Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1220 (Ill. 1992) ("If the court determines that these allegations fall within, or *potentially within,* the policy's coverage, the insurer has a duty to defend the insured against the underlying complaint."). Latching onto the words "arguably" and "potentially," AU says that as long as the *Sprint* and *T-Mobile* complaints did not *foreclose* the possibility of a trade dress claim, there was coverage under the policy. *See Pekin Ins. Co. v. Hallmark Homes, L.L.C.*, 912 N.E.2d 250, 257-58 (Ill. App. 2009) ("The insurer may refuse to defend only if the allegations of the underlying complaint preclude any possibility of coverage.") (internal quotation marks and alterations omitted). Specifically, AU contends that because the carriers brought claims under § 43(a) of the Lanham Act, and because § 43(a) "is the express statutory basis for a claim of 'trade dress' infringement," the complaints do not preclude the possibility of a trade dress claim. Doc. 114 at 7-8.

AU's submission is a logical fallacy akin to concluding that because all poodles are dogs, all dogs must also be poodles. "[Section] 43(a) creates a federal cause of action for trademark *and* trade dress infringement claims," *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780

9

(1992) (emphasis added)—not just trade dress claims. So the fact that Sprint and T-Mobile sued under § 43(a) and *could have* brought trade dress claims against AU under that provision does not mean that they actually *did* so. To determine what Sprint and T-Mobile actually *did*, it is necessary to examine their complaints; as AU itself repeatedly stresses, legal labels do not matter—only the alleged conduct does. *See Amerisure Mut. Ins. Co.*, 622 F.3d at 815; *Cincinnati Ins. Co.*, 260 F.3d at 745.

The only alleged conduct that AU's brief opposing summary judgment cites to show that it was subject to a trade dress claim appears in ¶ 47 of T-Mobile's complaint (there is no corresponding paragraph in Sprint's complaint), which reads in full: "The activities discussed herein demonstrate that [AU] sell[s] *virtually identical looking*, directly competing products and services to the same purchasers through the same channels of trade utilizing the same advertising vehicles." Doc. 100-4 at ¶ 47 (emphasis added). In context, this paragraph indisputably refers not to look-alike phones that infringe T-Mobile's trade dress, but to AU's alleged practice, described in the paragraphs immediately preceding ¶ 47, of obtaining genuine T-Mobile phones—subsidized phones sold by T-Mobile or its authorized dealers—and then "unlock[ing] the[m], … improperly repackag[ing] the[m] under the T-Mobile Marks, remov[ing] all warranties and manuals, fraudulently activat[ing] the SIM cards …, and traffic[king] and resell[ing] the unlocked, counterfeit, and repackaged" phones to customers. *Id.* at ¶ 41; *see also id.* at ¶ 46 (alleging that one of AU's employees "opened the phone's packaging, removed the SIM card, and told the undercover investigator that all of the phones [AU] purchase[s] are shipped overseas"). That is an allegation of trademark, not trade dress, infringement under § 43(a). *See Greenwich Ins. Co.*, 882 N.E.2d at 1204; *Schwinn Bicycle Co.*, 870 F.2d at 1182 (noting that "a product's *trade dress* is the overall image used to present it to its purchasers,"

whereas a "*trademark* on the other hand is thought of as something more specific, such as a logo") (internal quotation marks and brackets omitted).

In its reply brief supporting its own summary judgment motion, Doc. 130 at 10, AU also points to the *Sprint* complaint's allegation that:

> [AU's] and/or their co-conspirators' use of the Sprint Marks in connection with the unlocked, counterfeit Sprint Phones, which do not include warranties, manuals, accessories and related items *made part of the Sprint Phone package*, constitutes a misappropriation of the distinguishing and identifying Sprint Marks that was created as a result of significant effort and expense.

Doc. 100-3 at ¶ 165 (emphasis added); *see also* Doc. 100-4 at ¶ 93 (same, in *T-Mobile*). Latching onto the "[p]hone package" snippet, AU argues that the paragraph alleges a trade dress claim. Read in context, however, "package" obviously refers to the collection of items that the carriers sell in a single box: namely, the "warranties, manuals, accessories, and related items" in addition to the phone itself. It does *not* mean the look and feel of cellphone's metal and plastic body. *Cf. Apple Inc. v. Samsung Electronics Co.*, 735 F.3d 1352, 1358 (Fed. Cir. 2013) (describing trade dress allegations relating to the iPhone's "rectangular" body, including its "four evenly rounded corners; … flat clear surface covering the front of the product; … metallic bezel around the flat clear surface; … [and] substantial black borders above and below the display screen"). The allegation also makes clear that AU's "use of the Sprint Marks" on the resold phones was what confused customers—not that AU was selling imitation phones that, independent of the Marks, happened to look like Sprint (or T-Mobile) phones. AU's out-of-context reading of "package" therefore does not convert this straightforward trademark claim into one for trade dress.

AU further contends that if the question whether the policy covers the underlying suits is open to dispute, Harleysville had a duty to defend in those suits. In support, AU cites only *General Agents Insurance Co. of America v. Midwest Sporting Goods Co.* ("*Gainsco*"), 828

11

N.E.2d 1092 (Ill. 2005), which stated: "Gainsco thus remained obligated to defend Midwest as long as any questions remained concerning whether the underlying claims were covered by the policies." *Id.* at 1104. As an initial matter, *Gainsco* is inapposite because there is no question here that the Harleysville policy excluded coverage. In any event, *Gainsco* involved an insurer who *had* tendered a defense; the Supreme Court of Illinois said only that a defense, once tendered, could not be *withdrawn* in the face of ambiguity. *Id.* at 1103-04. The reason:

> If an insurance carrier believes that no coverage exists, *then it should deny its insured a defense at the beginning* instead of defending and later attempting to recoup from its insured the costs of defending the underlying action. …
>
> [T]o allow the insurer to force the insured into choosing between seeking a defense under the policy, and run the potential risk of having to pay for this defense if it is subsequently determined that no duty to defend existed, or giving up all meritorious claims that a duty to defend exists, places the insured in the position of making a Hobson's choice.

*Id*. at 1102 (emphasis and paragraph break added, quotation marks omitted).

Harleysville did exactly what *Gainsco* said was permissible: it denied AU a defense from the outset. *Ibid*.; *see also Littlefield v. McGuffey*, 979 F.2d 101, 105 (7th Cir. 1992) ("A liability insurer in Illinois may choose from three options when it is asked to defend an insured against claims that it believes might exceed the scope of coverage: (1) seek a declaratory judgment regarding its obligations before or pending trial of the underlying action; (2) defend the insured under a reservation of rights; or (3) refuse either to defend or to seek a declaratory judgment at the insurer's peril that it might later be found to have breached its duty to defend."). In fact, *Gainsco*'s bottom line was that, having chosen to tender a defense, the insurer could not recoup the costs of that defense absent an explicit contractual clause allowing it to do so. 828 N.E.2d at 1104. But AU's policy *has* such a clause. Doc. 100-1 at 64 ("If we initially defend an insured or pay for an insured's defense but later determine that the claim(s) is (are) not covered under this insurance, we will have the right to reimbursement for the defense costs we have incurred."). So

even under AU's (mistaken) reading of *Gainsco*, Harleysville would not have been obligated to bear the costs of AU's defense or liability in the underlying suits.

As a last gasp, AU argues that the *Sprint* and *T-Mobile* complaints alleged "[t]he use of another's advertising idea in your 'advertisement,'" which is covered under the policy. Doc. 120 at ¶ 70; *see* Doc. 100-1 at 59 (Policy § II.F.14.f). According to AU:

> The "advertising idea" that the AU Parties allegedly misappropriated and used was the Sprint/T-Mobile logo, packaging and/or name, and the concept of the implied authority that came with reselling a product bearing the Sprint and T-Mobile brands and trademarks.

Doc. 114 at 7. But that is a description of trademark infringement, not the use of another's advertising idea. "Misappropriation of an advertising idea occurs when the insured wrongfully takes a competitor's idea about the solicitation of business." *Del Monte Fresh Produce N.A., Inc. v. Transp. Ins. Co.*, 500 F.3d 640, 646 (7th Cir. 2007). Nothing in the *Sprint* or *T-Mobile* complaints alleges that AU stole their ideas about how to solicit customers or business. Quite the contrary: they allege that AU's advertisements improperly induced customers to purchase subsidized phones and immediately resell them—something the carriers discourage, not encourage. Doc. 100-3 at ¶ 39; Doc. 100-4 at ¶ 42.

Because none of the conduct described in the underlying complaints, even generously read, could arguably form the basis for claims of trade dress infringement or misappropriation of an advertising idea, the lawsuits were not covered by the policy and Harleysville had no duty to defend AU. And because Harleysville had no duty to defend, it necessarily had no duty to indemnify. *See Momence Meadows Nursing Ctr.*, 566 F.3d at 693 ("Holding that an insurer has no duty to indemnify therefore follows inexorably from holding that an insurer has no duty to defend."); *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1081 (Ill. 1993) ("In cases such as the instant case where no duty to defend exists and the facts alleged

13

do not even fall *potentially* within the insurance coverage, such facts alleged could obviously never *actually* fall within the scope of coverage. Under no scenario could a duty to indemnify arise. Clearly, where there is no duty to defend, there will be no duty to indemnify and we find that the plaintiff-insurers have no duty to defend or indemnify the insureds in this case."). Summary judgment is accordingly granted to Harleysville and denied to AU.

## II. Timeliness of AU's Tender

Even if the claims against AU in the underlying suits were covered by the policy, AU would still lose this coverage case because its July 31, 2013 tender to Harleysville was untimely. Untimely notice is an absolute bar to insurance liability in Illinois. *See Country Mutual Ins. Co. v. Livorsi Marine, Inc.*, 856 N.E.2d 338, 346 (Ill. 2006) ("once it is determined that the insurer did not receive reasonable notice of an occurrence or a lawsuit, the policyholder may not recover under the policy"); *Kmart Corp. v. Footstar, Inc.*, __ F.3d __, 2015 WL 448633, at *10 (7th Cir. Feb. 4, 2015) (same). Notice clauses "are important provisions. If a claim against an insured is covered by the insurance policy, the insurer has a vital interest in supervising the defense against the claim, for its money is riding on the outcome. And so the policies entitle the insurers to control the insured's defense against a covered claim and negotiate a settlement." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Mead Johnson & Co. LLC*, 735 F.3d 539, 543 (7th Cir. 2013).

The *Sprint* and *T-Mobile* suits were filed on November 13 and December 18, 2012, and AU did not send its tender to Harleysville until more than seven months later, on July 31, 2013. As noted, § II.E.2.b of the policy required AU to notify Harleysville in writing of a lawsuit "as soon as practicable." Doc. 120 at ¶ 72; *see* Doc. 100-1 at 56. Faced with a materially identical notice provision, *see Country Mutual*, 856 N.E.2d at 340, the Supreme Court of Illinois held that "[a] policy condition requiring notice '[a]s soon as practicable' is interpreted to mean 'within a

14

reasonable time.'" *Id*. at 343 (second alteration in original). "Where the facts are undisputed, the reasonableness of notice to an insurer by its insured is a question of law." *Montgomery Ward & Co. v. Home Ins. Co.*, 753 N.E.2d 999, 1004 (Ill. App. 2001); *see also Cas. Indem. Exch. v. Vill. of Crete*, 731 F.2d 457, 458 (7th Cir. 1984) ("[I]f there are no disputed material facts, the court may in appropriate circumstances decide the issue of reasonable notice as a matter of law."). "The following factors may be considered in determining whether notice to an insurer has been given within a reasonable time: (1) the specific language of the policy's notice provision; (2) the insured's sophistication in commerce and insurance matters; (3) the insured's awareness of an event that may trigger insurance coverage; (4) the insured's diligence in ascertaining whether policy coverage is available; and (5) prejudice to the insurer." *W. Am. Ins. Co. v. Yorkville Nat. Bank*, 939 N.E.2d 288, 293-94 (Ill. 2010).

Application of these factors preclude a finding of timeliness. First, the policy categorically required that Harleysville "receive written notice of the claim or 'suit' as soon as practicable." Doc. 120 at ¶ 72. There is no qualification or condition: if suit, then notice. AU was represented by counsel throughout the underlying lawsuits. No reasonable juror could believe that it was "impracticable" for a competent lawyer to contact Harleysville when those suits were filed and that it remained "impracticable" for seven months thereafter. Illinois courts have found shorter delays to be unreasonably long. *See Cas. Indem. Exch.*, 731 F.2d at 459 (five months); *Ill. Valley Minerals Corp. v. Royal-Globe Ins. Co.*, 388 N.E.2d 253, 256 (Ill. App. 1979) (six months).

The second and third factors also weigh against AU. Vadria and Yasin may have been unsophisticated in legal or insurance matters, but they and AU Electronics were represented by counsel throughout. If their lawyer did not understand the issues, he should have sought help.

15

*See* Ill. Rules of Prof'l Conduct 1.1 & cmt. 2; *cf. Modrowski v. Mote*, 322 F.3d 965, 968 (7th Cir. 2003) ("clients … must 'vigilantly oversee,' and ultimately bear responsibility for, their attorneys' actions or failures"). To be clear, the court does not in any way mean to suggest that AU's lawyer was incompetent for not immediately tendering its defense to Harleysville; in fact, as noted above, the *Sprint* and *T-Mobile* complaints did *not* allege conduct or claims that were even potentially covered under the policy, so the lawyer's decision not to notify Harleysville was reasonable under the circumstances. But the court has assumed for purposes of the timeliness issue that there was coverage, and if indeed there was, AU's representation by counsel gave it sophistication in commerce and insurance matters as well as an awareness of events (the filing of the underlying suits) that might have triggered coverage.

The fourth factor favors Harleysville, too. Although AU and its lawyer reviewed the policy after being served with the underlying complaints, Doc. 105 at ¶ 11, they nevertheless failed to alert Harleysville for more than seven months. AU attempts to excuse its tardiness by claiming that only after it saw Sprint's and T-Mobile's July 2013 disclosures (the lists of people with whom they claimed AU had conspired) did it "determine[] that for the first time, [it] had a reasonable basis for seeking coverage or indemnification" from Harleysville. Doc. 105 at ¶ 23. It is true that "an insured's reasonable belief of noncoverage under a policy may be an acceptable excuse for the failure to give timely notice." *W. Am. Ins. Co.*, 939 N.E.2d at 294-95. But note the qualifiers "reasonable" and "may be." The July 2013 disclosures contain lists of AU's customers, culled from AU's *own* invoices. No reasonable juror could believe that a "diligent" insured would be surprised upon being given information that was already in its possession. Moreover, AU does not and could not plausibly explain how a *list of alleged co-conspirators* alerted it that what it previously believed to be trademark claims were actually trade dress

claims.  AU's excuses for failing to notify Harleysville are not only unreasonable, they are absolutely implausible.  *See Imperial Cas. & Indem. Co. v. Chi. Hous. Auth.*, 987 F.2d 459, 462 (7th Cir. 1993) ("[T]he CHA's argument that it could not learn of the relationship between the apartment conditions during the policy period and the 1985 incident until the doctors' depositions is ridiculous.  The doctors' deposition testimony repeated what the CHA could have, and should have, learned from the letters.").

The fifth factor favors neither party.  On the one hand, the settlement amounts are modest: AU's counsel stated in open court on May 28, 2014 that AU is seeking about $80,000 from Harleysville.  Given the seriousness of the allegations in the carriers' complaints, that seems to be a bargain (and well under the policy limits to boot), which suggests a lack of prejudice to Harleysville by the late notice.  *See Nat'l Union Fire Ins. Co.*, 735 F.3d at 542-43.  On the other hand, Harleysville was denied an opportunity to investigate the claims and control the litigation and settlement negotiations, which Illinois courts have said can be prejudicial.  *See Northbrook Prop. & Cas. Ins. Co. v. Applied Sys., Inc.*, 729 N.E.2d 915, 924 (Ill. App. 2000) ("[A]s a result of Applied's inaction, we find Northbrook was prejudiced in that it was precluded from being able to meaningfully participate in the pretrial discovery occurring prior to Applied's notification, which the record reveals to have been substantial.").

With four of the five factors strongly pointing Harleysville's way, and with the remaining factor being a draw, AU's July 31, 2013 tender was not within a reasonable time of the *Sprint* and *T-Mobile* lawsuits' respective filings—and "once it is determined that the insurer did not receive reasonable notice of an occurrence or a lawsuit, the policyholder may not recover under the policy."  *Country Mutual*, 856 N.E.2d at 346; *see also Kmart Corp.*, 2015 WL 448633, at *10.  Accordingly, Harleysville is entitled to summary judgment on this ground as well, which is

offered in addition to the first ground discussed in Section I, *supra*. Given these two independent and dispositive grounds for granting judgment to Harleysville, the court need not reach any of the additional arguments it has raised.

## Conclusion

For the foregoing reasons, Plaintiffs' summary judgment motion is denied, and Defendants' summary judgment motion is granted. Defendants had no duty to defend or indemnify Plaintiffs in the underlying lawsuits. Given this disposition, Plaintiffs' motion for leave to file an amended complaint, Doc. 55, which seeks to add a claim for bad faith/improper claims practice under 215 ILCS 5/154.6 and 5/155, is denied. Because Defendants did not violate their obligations under the policy, they cannot be held liable for engaging in bad faith or improper practices under those statutes. *See Westchester Fire Ins. Co. v. G. Heileman Brewing Co.*, 747 N.E.2d 955, 968 (Ill. App. 2001) ("The fact that we have found that Westchester's filing of its federal declaratory action comported with Illinois law and have reversed the trial court's judgment entered to Heileman conclusively shows that Westchester's actions in denying coverage were not vexatious and unreasonable."); *O'Rourke v. Access Health, Inc.*, 668 N.E.2d 214, 222 (Ill. App. 1996) ("[D]efendant could not have committed the vexatious and unreasonable conduct necessary for section 155 relief where, as here, no benefits are owed."); *Windale LLC v. Greenwich Ins. Co.*, 2003 WL 22089536, at *1 (N.D. Ill. Sept. 8, 2003) ("Under Illinois law a plaintiff must first demonstrate that a defendant insurance company owed benefits before it can prove that defendant acted in bad faith pursuant 215 ILCS § 5/155."). Judgment will be entered in Defendants' favor.

March 10, 2015

United States District Judge